**INVESTORS DIVERSIFIED SERVICES, Inc.**

v.

**RECONSTRUCTION FINANCE CORPORATION.**

Civ. A. No. 53–949.

United States District Court
D. Massachusetts.

Sept. 13, 1956.

Maguire, Roche & Garrity, W. Arthur Garrity, Jr., Boston, Mass., for plaintiff.

Abraham B. Casson, Boston, Mass., for defendant.

FORD, District Judge.

This is a contract action by Investors Diversified Services, Inc., (hereinafter designated as IDS) to recover an additional amount it alleges is due to it from the proceeds of a transaction in which it participated with the defendant Reconstruction Finance Corporation (hereafter designated as RFC). Defendant has filed a counterclaim based on the same transaction. Plaintiff moves for summary judgment. The facts material to this motion are agreed upon, appearing for the most part in a stipulation of the parties.

On March 18, 1947, IDS (then known as Investors' Syndicate of Minneapolis) and RFC entered into a participation agreement concerning a loan to be made to Anchorage Homes, Inc. Pertinent portions of the agreement executed on a standard RFC form are as follows:

"Investors' Syndicate of Minneapolis (herein called 'Bank') hereby agrees, promptly upon written demand by Reconstruction Finance Corporation (herein called 'RFC'), to purchase for cash from RFC a participation of 50 percent of each disbursement made by RFC on account of a loan which RFC proposes to make to Anchorage Homes, Inc. Westfield, Massachusetts (herein called 'Borrower'), and RFC hereby agrees simultaneously with each such purchase to issue to Bank a Participation Certificate (on RFC Form L–302) evidencing the interest purchased by Bank in said loan, subject to the following terms and conditions:

"1. *Condition for Disbursement.* —Said loan shall be disbursed by RFC subject to the terms and conditions set forth in the authorization of RFC dated January 14, 1947, and all amendments thereto adopted prior to the date of first disbursement.

"2. *Right to Repurchase Bank's Interest.*—Upon five (5) days' written notice RFC may at its option at any time repurchase Bank's interest in said loan.

"3. *Control of Note and Collateral.*—RFC shall hold the note evidencing said loan, all the collateral therefor and all instruments delivered in connection therewith, shall receive all payments on account of principal of or interest on said loan and promptly remit to Bank its pro rata share thereof determined according to their respective interests in said loan, and shall use due diligence to recover from Borrower all expenses properly incurred by RFC or Bank which are reimbursable from Borrower and remit to Bank its respective share thereof; *Provided, however,* That RFC shall not (except to the extent permitted by said authorization), without the prior written consent of Bank, (a) make or consent to any alteration in the terms of said note, collateral, or instruments; (b) make or consent to any release, substitution, or exchange of any of said collateral; (c) accelerate the maturity of said note; (d) sell, assign or transfer any of said collateral; (e) sue upon said note, collateral, or instruments; or (f) waive any claim against Borrower or any guarantor, standby creditor, or other obligor in connection with said loan. All expenses incurred by RFC or Bank which are not recoverable from Borrower shall be shared ratably by RFC and Bank in accordance with their respective interests in said loan. * * *

* * * * * *

"6. *Liability and Representations.*—Neither party hereto makes any express or implied warranty of any kind with respect to said loan, and neither party shall be liable to the other for any loss not due to its own gross negligence; but all such losses shall be borne ratably by RFC and Bank, in accordance with their respective interests in said loan. Article 7. (See Below)

"* * * * *"

An additional provision typed at the foot of the standard form reads:

"7. *Interest Payable on Bank's Share of Loan.*—Bank's share of the interest paid by Borrower shall be computed at the rate of 4½% per annum on Bank's agreed participation outstanding."

Interest of RFC's share of the loan was 4% per annum.

RFC thereafter, in April 1947, advanced to Anchorage a loan of $700,000, of which sum $350,000 was advanced to RFC by IDS. Anchorage gave to RFC a note for the $700,000 with a first mortgage on its real estate and a first chattel mortgage on all its tangible personal property. In July 1947, RFC made another loan to Anchorage of $400,000 (with no participation by IDS or any other lender), taking as security second mortgages on the real estate and personal property and a merchandise lien under a factoring agreement.

On November 24, 1947, Anchorage, in financial difficulties, filed a petition for corporate reorganization in this court. In this proceeding RFC filed a claim for the unpaid principal and interest on both loans as of November 24, 1947, amounting to principal of $677,390 and interest of $4,997.64 on the first loan and principal of $400,000 and interest of $3,287.-67 on the second loan. After the trustee in reorganization had advised the court that no plan contemplating continued operation of debtor's business could be effected, a plan for liquidation of Anchorage was approved. As provided in the plan and in accordance with an order of the court entered November 17, 1948, the trustee conveyed to RFC all the property, real and personal securing the two loans (except minor items sold during the proceedings by the trustee with approval of the court and consent of RFC and IDS). The instrument of conveyance recited that the transfer was made "in full satisfaction and discharge * * * of any and all claims, including claims for interest" of RFC against the debtor, including claims arising out of or in connection with the $700,000 and $400,000 loans. It is stipulated that on November 17, 1948 the total value of the property thus conveyed which had been given as collateral for the note of April 24, 1947 was $517,083.

Thereafter RFC made numerous expenditures in connection with the maintenance of the property and attempts to sell it. Each month it billed IDS for one-half of these expenditures and all such bills were paid to RFC by IDS. From 1949 to 1951 IDS incurred a total expense of $5,226.41 for fire insurance on its interest in the property. RFC acted as a self-insurer. RFC sold the personal property and a model home included in the real estate and paid over one-half of the proceeds of these sales to IDS.

For several years attempts were made to dispose of the factory building which constituted the principal item of real estate. In 1949, during the course of negotiations for a proposed lease of the factory, with an option to purchase the property for $1,000,000, RFC proposed to IDS that the rental income therefrom should be divided on the basis of the parties' respective disbursements toward the first and second loans, 35/95 to IDS and 60/95 to RFC. IDS refused to agree to this proposed division. Finally, in 1951, a purchaser was found for the building at a price of $850,000. On February 1, 1951, an initial payment of $170,000 was made. On October 3, 1951, a final payment was made. After adjustments and payment of a broker's commission, the net proceeds of the sale were $828,511.48.

RFC, on March 7, remitted to IDS $85,000, one-half the initial payment. On December 11, 1951, RFC sent to IDS its check for $293,425.86, representing what it said was IDS's share of the net proceeds on a final accounting of the whole transaction. The payment appears to have been computed on the basis that IDS was entitled to recover its share of the principal of the first loan, interest thereon to November 17, 1948, and the amounts previously paid to RFC for its share of the expenses incurred. The December 11 payment with the payments

previously made to IDS would produce that amount. If RFC credited itself with corresponding payments as to its share of the first loan, a balance would still be left from the proceeds of the sale of the factory to be credited to RFC on account of its second loan. Plaintiff accepted the payment under protest and without prejudice.

Plaintiff now advances two theories of recovery. First, it contends that its status was that of a co-mortgagee with RFC under the first mortgage, that such mortgage continued in existence up to the time of the final sale of the collateral subject to the mortgage, and that the co-mortgagees are entitled to recover interest on the unpaid principal up to the time when it was finally paid. Hence, it says that, in addition to the payments already received, it should be paid interest for the period from November 17, 1948 to October 3, 1951 to the extent that funds are available from the proceeds of the sale of the property to make such payments. IDS further argues that it is entitled to interest on the amounts remitted to RFC to cover expenses incurred for the period until RFC repaid these amounts, but does not press this claim since it appears that the proceeds of the sale of the property are not sufficient to meet even its full claim for interest on the principal of the loan. Alternatively, it argues that the conveyance of the property by the trustee to RFC in the reorganization proceedings amounted to a foreclosure of the first mortgage which wiped out the second mortgage and left IDS and RFC in the position of co-owners of the property on the basis of their share in the first mortgage. Hence, IDS is entitled to one-half the proceeds of the sale of the property.

Under either theory of its case, IDS also says that it is entitled to be reimbursed for the $5,226.41 paid by it for fire insurance on its interest in the property.

RFC now contends that the basis on which the payment of December 11, 1951 was made was not the correct one. Its present theory of the case is that IDS was not a co-mortgagee or co-owner of the note but that its right under the participation agreement was to have RFC pay over to it its share of so much of the borrower's obligation to RFC as RFC could collect. At least with the trustee's conveyance to RFC the loan transaction was at an end. RFC had taken title to the collateral in full satisfaction of its claims and IDS was then entitled to receive one-half of the value of the property as it then stood. In view of the delay of RFC in making this payment it is willing to allow IDS interest at 4½% from that date until the date of payment. On this basis it argues that it has in fact paid IDS more than the sum to which it was entitled and counterclaims for the amount of the overpayment.

In determining the relationship between IDS and RFC, and the consequent rights of the parties, the fundamental and controlling fact is the agreement of the parties as embodied in the participation agreement. Plaintiff's theories of recovery are all based on the view that it was a co-owner of the property conveyed to RFC. The participation agreement does not support this view. That provided for no direct relationship between IDS and the borrower. The borrower's dealings were solely with RFC. The note and mortgage ran only to RFC. Only RFC appeared in the reorganization proceedings. The trustee conveyed the property to RFC alone.

The agreement speaks only of the purchase by IDS of a participation in the loan. IDS advanced money not directly to the borrower, but to RFC. Only RFC assumed any obligation to IDS. That obligation involved no guarantee by RFC of any repayment to IDS by the borrower. RFC was required only to use due diligence to collect from the borrower the principal and interest on the loan, together with expenses properly incurred, and out of what it collected to remit to IDS its proper share in accordance with the participation interest which it had purchased. The specific restrictions placed on RFC by paragraph 3 of the agreement only emphasize that apart

from such restrictions RFC was free to deal as it wished with the borrower in a manner inconsistent with any supposed intent that IDS and RFC stood on equal footing in direct relation to the borrower as co-owner on the note and mortgage. The provision for the *repurchase* of IDS's interest by RFC emphasizes this. If the interest of IDS had been that of a co-owner of the obligation of the borrower, rather than merely of an interest purchased from RFC, it would have been more proper to speak of a *purchase* of IDS's interest by RFC rather than a repurchase.

▪ The final result, however, would not seem to be affected, since, even though RFC alone was the owner of the note and mortgages on the first loan, it was bound to assert any right it had in that capacity to priority over its claims in its capacity as maker of the second loan, and to pay over to IDS its proper share of whatever was thus collected on the first loan transaction. Hence, the essential question for determination seems to be that of the standing of RFC as maker of the first loan after the conveyance to it by the trustee on November 17, 1948.

▪ From the language of the trustee's deed, previously quoted, it is clear that the conveyance to RFC was intended to be in full satisfaction of both loans to Anchorage. The form of this deed was specifically approved by the court. It was in accord with the plan of liquidation of Anchorage of which it was a part. After the consummation of the plan Anchorage no longer existed and it would be completely unrealistic to speak of any obligation on the part of Anchorage to continue to pay interest on the loan when it no longer existed and after the collateral had been conveyed to RFC in full settlement. The obligation of RFC to IDS was measured by the extent to which RFC could collect from the borrower. Taking the view most favorable to IDS, the most to which it was entitled was a return of its share of the principal of the loan with interest to November 17, 1948, when by the trustee's conveyance the loan

transaction was completed and after which no further obligation of Anchorage to RFC existed. Full payment of IDS's share of the principal and interest to November 17, 1948 has been made by RFC.

▪ Payments made by IDS for its share of expenses incurred have all been reimbursed, so on that score IDS has no further claim against RFC. IDS made all of these payments after November 17, 1948, when they could no longer be charged to the borrower. Thus they are not within the class of expenses described in the participation agreement as reimbursable from the borrower. As to these, the note from Anchorage to RFC provided these amounts could be added to principal and interest upon them collected from the borrower. The expenses involved here are of the type not recoverable from the borrower. Since the participation agreement provides only for the ratable sharing of such expenses by RFC and IDS, and says nothing about interest, there seems to be no basis for IDS's claim to interest from RFC on the various amounts it advanced to RFC to cover its share of these expenses.

▪ Plaintiff's first theory of recovery is based on its argument that the acquisition of title to the mortgaged property by the holder of the first mortgage will not result in a merger of title and the wiping out of the mortgage, where the preservation of the mortgage is necessary to protect the rights of the first mortgagee and a second mortgagee. Kneeland v. Moore, 138 Mass. 198. This principle has no application so far as plaintiff's claims here are concerned, since the rights of the RFC as first mortgagee were limited by the trustee's deed to recovery of the principal of the loan with interest to November 17, 1948, and IDS has been paid in full its share of such claim.

▪ Plaintiff's alternative contention is the conveyance amounted to an equitable or legal foreclosure which destroyed the second mortgage and made IDS a co-owner with RFC, entitled to one-half of whatever was realized on the eventual

sale of the property. This contradicts the plain language of the deed which conveyed the property in settlement of the claims of RFC on both loans, and not just those based on the first loan. Moreover, as has been pointed out, under the participation agreement, RFC alone was the holder of the note and mortgage, and eventually the sole owner of the property conveyed. Plaintiff's rights rise no higher than those given it by the agreement, that is, to satisfaction of its claims for principal, interest, and expenses based on the first loan. Application of plaintiff's theory would only confirm the right of RFC to the entire proceeds of the sale after satisfaction of IDS's claim under the participation agreement.

■■ The action of RFC in charging to IDS one-half the expenses incurred with respect to the property furnishes no basis for estoppel. This division of expenses was no representation that IDS was a half-owner of the property. It is stipulated that the fair market value of the property at the time of the conveyance was less than the claims based on the first loan, and until it appeared that a disposition of the property would bring in more than enough to satisfy those claims, the fair basis for division of expenses was in proportion to the interests in that loan, as provided in the participation agreement. Significantly, when it did appear for a time in 1949 that it might be possible to dispose of the property for an amount more than sufficient to meet the first loan claims, RFC proposed a new division between the parties based on their interests in both loans.

Moreover, IDS has not shown that it in any way altered its position to its disadvantage as a result of RFC's actions. It did pay one-half of the expenses, but it has been reimbursed for them. And it gained from the delay in selling the property since the sale eventually produced an amount sufficient to meet the full claims based on the first loan.

■ The payments made by IDS for insurance were made on the theory that it was a co-owner of the property. As has been pointed out, under the agreement it had no direct interest in the property itself, hence, no basis for contending that insurance was a justifiable expense on its part. Since the insurance was procured on its own initiative and without any agreement by RFC with respect to it, there is no ground for holding that any part of this expenditure can properly be charged to RFC.

Defendant's contention in its counterclaim that IDS has in fact been paid too much does not appear to have been fully discussed by the parties. Other elements of the counterclaim may involve issues of fact to be tried. The present holding is only that plaintiff has not shown it is entitled on the stipulated facts to any further payment. At most it was entitled to no more than has already been paid to it.

Plaintiff's motion for summary judgment is denied.