INVESTORS DIVERSIFIED SERV-
ICES, Inc.,

v.

RECONSTRUCTION FINANCE
CORPORATION.

Civ. A. No. 53-949.

United States District Court
D. Massachusetts.

July 15, 1957.

Maguire, Roche & Garrity and W. Arthur Garrity, Jr., Boston, Mass., for plaintiff.

Abraham B. Casson, Boston, Mass., for defendant.

FORD, District Judge.

A previous motion of plaintiff in this case for summary judgment was denied, Investors Diversified Services, Inc., v. Reconstruction Finance Corporation, D. C., 144 F.Supp. 497. Plaintiff now renews its motion and defendant also moves for summary judgment on its counterclaim.

Plaintiff's renewed motion is based on certain additional facts appearing from defendant's further admissions of facts under Rule 36, Federal Rules of Civil Procedure, 28 U.S.C.A., and on two new theories of recovery which it now sets forth.

These additional facts consist chiefly in statements made in the course of correspondence between the parties, or between RFC and third parties or in internal communications between personnel of RFC in which reference is made to the fact that IDS has an "interest" or a "50% interest in ownership" in the Anchorage plant conveyed to RFC. Any such statements, of course, could not change or amend the original participation agreement, since this could be done only by the Board of Directors of RFC or by other officials of RFC duly authorized to make such changes. The fact that RFC personnel may have thought that IDS had a 50 per cent ownership interest in the property is not significant where it is clear, as pointed out in the previous opinion of the court, that under the participation agreement IDS had no ownership interest in the property itself, but only an interest in RFC's loan. In any case, none of these statements was made for the purpose of explicitly defining the status of IDS with regard to the property involved. They were all in the nature of incidental references to the position of IDS. In fact IDS did have an "interest" in the property in the sense that it was only from the proceeds of the disposal of the property that it could obtain payment of its claims based on the loan, and furthermore under the terms of the agreement RFC had to obtain the consent of IDS before disposing of the property. Moreover, since there were grounds for believing the proceeds of the property might not amount to more than enough to cover the claims based on the first loan, it was not unnatural to refer to the interest of IDS as a "50% interest." The language of these documents appears to be only a loose or shorthand way of describing the existing situation, and in no way amounts to any express recognition that IDS was the co-owner of the property in the strict sense for which IDS now contends.

Plaintiff argues at length that in regard to the loan made under the participation agreement the parties here were joint adventurers. But it does not help in the solution of the issues here to classify the relationship by the still not fully defined name of joint adventure. Cardullo v. Landau, 329 Mass. 5, 8, 105 N.E. 2d 843. Merely calling the transaction a joint adventure gives no ground for changing the rights of the parties as spelled out in the participation agreement. Similarly plaintiff contends that a trust relationship existed between the parties, arguing alternatively for an express trust, a constructive trust, or a resulting trust. Again the basic issues here are not solved by saying that RFC held the property or the proceeds thereof in trust for itself and IDS as beneficiaries. Calling the relationship a trust does not help to determine how the proceeds are to be distributed to the beneficiaries. The share of the proceeds to which plaintiff is entitled must still be determined by the provisions of the participation agreement.

There is no merit to plaintiff's contention that the participation agreement was no longer in effect after November 17, 1948, on the ground that it contemplated an existing loan and the loan no longer was in existence after that date. The agreement was clearly intended to cover the whole transaction into which the parties were entering. Even though after November 17, 1948,

there was no longer any loan in existence in the sense that the borrower had no further liability, the transaction cannot be said to have ended while property or funds received in satisfaction of the loan had not yet been distributed.

Plaintiff moreover relies on Article 6 of the agreement as remaining in effect at all times. This article requires that losses be borne ratably by RFC and plaintiff. The only loss, however, for which plaintiff indicates it should be compensated is for interest from November 17, 1948, until the date of payment, based on the view that RFC wrongfully withheld the money during that period, thus depriving IDS of the use of its funds. It is difficult to see any valid basis for this argument in the light of the fact that the delay was due solely to the desire to obtain the best possible price for the property, and seems to have been taken with the full consent of plaintiff. Assuming, however, that RFC should have sold the property at once, the only basis on which it can now be determined what IDS should have received is to assume that the property would have been sold for its value at that time as stipulated by the parties. Half of that sum with interest to the date of actual payment would be less than what IDS has actually received, and plaintiff, of course, rejects this solution when defendant advances it as a basis for its counterclaim.

Plaintiff further contends that the court's previous ruling that the property conveyed to RFC by the trustee in reorganization was in satisfaction of both loans was erroneous by pointing out that the conveyance included raw materials not covered by the mortgage given in connection with the first loan and on which a first mortgage was given to RFC as part of its security on the second loan. Hence it is contended that the conveyance should be interpreted as conveying the real estate and personal property solely in satisfaction of the first loan and the raw materials alone in satisfaction of the second loan. But this contradicts the plain language of the trustee's conveyance which transferred all the property in satisfaction of both loans with no attempt to distinguish between loans or assign specific property to the satisfaction of either of them. It offers no basis for holding that RFC lost its right to apply proceeds of the sale of the Anchorage plant to its loan secured by a second mortgage on that plant once the claims based on the first loan had been met. Of course, as plaintiff suggests, if the proceeds of the sale of all the property conveyed were more than enough to pay all the claims based on both loans, a question would arise as to the proper disposition of the surplus. But since there is no evidence at present before the court that such is the fact, the question does not arise on this motion.

To sum up, the real issue here is whether plaintiff has received all it contracted for in advancing money to RFC to be loaned to Anchorage. Clearly the participation agreement provides that it is to receive back its share of the principal advanced, interest thereon until the loan was terminated, and reimbursement for expenses. This is, in fact, exactly what it has received.

Plaintiff's motion for summary judgment denied.

### Defendant's Motion for Summary Judgment on Counterclaim

Defendant moves for summary judgment on its counterclaim, which is based on its contention that it has in fact overpaid the plaintiff.

Its first argument may be summarized as follows. The parties have stipulated that on November 17, 1948, the total value of the property conveyed to RFC which had been given as collateral for the loan of April 24, 1947, was $517,083. If RFC had exercised its right to insist on a foreclosure sale and the property had actually been sold on November 17, 1948, then RFC would have fulfilled its entire obligation under the participation agreement by then paying over to IDS one half of the proceeds of the sale, which amounted to less than IDS's share of the unpaid principal of the loan. The stipulation as to the value of the property was

in effect an agreement that if a foreclosure sale had been held on November 17, 1948, the property would have sold for $517,083. By virtue of this agreement as to value, the defendant's taking of a deed in lieu of foreclosure had the same effect as the holding of a foreclosure sale. Hence on that date RFC should have paid to IDS the sum of $258,541.50. The most to which IDS is entitled is that amount with interest to the date of actual payment and the difference between this and the total amount actually paid is an overpayment of $71,484.50.

▉ The participation agreement imposed on FRC the duty of receiving all payments of principal and interest on the loan and remitting promptly to IDS its proportionate share thereof. This in terms would appear to refer only to payments of money and there is no express provision in the contract as to the course to be followed when RFC received property rather than money in settlement of the loan. However, the most reasonable construction of the agreement would be that it implied that in such a case RFC would use reasonable diligence to convert such property into cash and remit to IDS its share of the proceeds. This certainly seems to have been the interpretation adopted by both parties at the time of the transaction, for it is clear that both agreed that the property should be held and effort made to find a buyer who would pay more than would have been realized from a forced sale of the property in November, 1948. It is true that at that time the parties might have agreed that the property should be regarded as having been sold at a stipulated value and settlement made by a payment to IDS on this basis. But the stipulation relied upon by RFC affords no basis for finding there was such an agreement. The stipulation was not made until April, 1956, as one item of a stipulation of facts for purposes of hearing in the course of this litigation. It is merely an agreement as to the value of the property as of the date in question. It may be that it could fairly be taken as an agreement that that is the amount which would have been realized on a foreclosure sale. But no foreclosure sale was ever held. The conduct of the parties shows clearly they wanted to avoid a foreclosure sale because they believed a negotiated sale would bring a higher price, as in fact it eventually did. In the light of these facts it would be unjustifiably distorting the stipulation to hold that it implied any agreement by defendant to adopt to its own disadvantage a basis of settlement of the loan which both parties avoided at the time of the actual transaction.

Defendant's second and alternative line of argument is directed to the proposition that IDS was entitled to receive only a return of the amount which it advanced to RFC as its share of the principal of the first loan and that so much of the amount actually paid as represents interest on the loan was an overpayment which should be recovered by RFC. Defendant contends that under Massachusetts law the giving of a deed of the property by the mortgagor to RFC as holder of both the first and second mortgages in lieu of foreclosure resulted in a merger of title of all the property in RFC and extinguished both debts and both mortgages. Purdie v. Roche, 304 Mass. 647, 24 N.E.2d 674; Peterson v. Abbe, 234 Mass. 467, 125 N.E. 611; Dickason v. Williams, 129 Mass. 182; Harrison v. Trustees of Phillips Academy, 12 Mass. 456. Hence, defendant argues, after November 17, 1948, there was only one amount which defendant could legally identify as having been advanced by it to the bankrupt, namely, the sum total of all unpaid loans.

▉ The Massachusetts cases relied on go no further than to support the proposition that by the giving of the deed by the trustee of the debtor in lieu of foreclosure, the debts were extinguished and the debtor could no longer be sued upon the mortgage notes. There is no question here of trying to recover further from the debtor on these notes. The only issue is how the proceeds of the sale of the property conveyed should

be distributed. Nothing in the Massachusetts case suggests that as between RFC and IDS the fact that there were two separate loans must now be disregarded. The fact that between RFC and Anchorage a single conveyance was made in satisfaction of all of Anchorage's debts without differentiation does not mean that as between RFC and IDS it is no longer significant that two loans were in fact made with differing priorities. In dividing the proceeds between RFC and IDS the determining factor is still the fact that there originally were these two loans. And even though from the debtor's standpoint the loan has been satisfied, the distribution of the proceeds must still take place in accordance with the participation agreement. In applying the single fund resulting from the sale of the property, RFC must still enforce its prior claim as first mortgagee before applying any of the fund to its claim based on the second loan.

The distribution, defendant argues, should be governed by the rule set forth in Sexton v. Dreyfus, 219 U.S. 339, 31 S.Ct. 256, 55 L.Ed. 244, that a secured creditor in bankruptcy who sells the collateral in satisfaction of the obligation due him must apply the funds first to the payment of principal and not to the payment of interest accrued since the date of the bankruptcy petition. Hence, it is argued, the proceeds of the sale of the property should have been applied first to the satisfaction of the principal of the first debt and the remainder to the satisfaction of the principal of the second debt before anything was applied toward interest on the first loan.

It is doubtful if the rule of the Sexton case has any application to the situation here. The Anchorage Homes, Inc., proceeding was a reorganization proceeding under Chapter X of the Bankruptcy Act, 11 U.S.C.A. § 501 et seq., and not an ordinary bankruptcy proceeding. It resulted in a plan under § 216(10) of the Act, 11 U.S.C.A. § 616(10), for the liquidation of the corporation. Such a liquidation is governed by the terms of the approved plan and is not necessarily the same in procedure or result as the liquidation which would take place in the ordinary bankruptcy proceedings had the court directed such proceedings under § 236 (11 U.S.C.A. § 636); see 6 Collier on Bankruptcy, ¶ 10.02, pages 3449, 3451, and cases there cited.

Even if the rule of the Sexton case should be applicable to plans of reorganization under Chapter X, it has no application to the question involved here. As pointed out in In re Gotham Can Co., 2 Cir., 48 F.2d 540, 542, the Sexton case related only to the amount of a secured claim which may be proved in bankruptcy. Since the ordinary unsecured creditor cannot include in his proof of claim interest accruing subsequent to the filing of the petition, the secured creditor whose claim is not fully satisfied by the sale of his security is not allowed to collect such interest from the bankrupt estate indirectly by applying the proceeds of the sale of the security to interest but must apply them to reducing the unsatisfied portion of his claim which he seeks to prove in bankruptcy. However, a secured creditor may collect all interest due him up to the date of payment out of the proceeds of the collateral if they are sufficient (Coder v. Arts, 213 U.S. 223, 245, 29 S.Ct. 436, 53 L.Ed. 772). Here RFC as first mortgagee admittedly realized enough on the sale of the property to collect the principal and interest on the first loan up to the date of its termination and Sexton is not applicable. Under its participation agreement with IDS on the first loan it clearly had the duty to do so before it applied any of the proceeds to the second and separate debt.

Defendant further asks, "That the Court find the plaintiff to be liable for compensation to the defendant for services rendered by the defendant, from March 18, 1947, through December 31, 1951, in connection with the care, maintenance and preservation of the mortgage security, as outlined in paragraph C of the defendant's amended counterclaim." What defendant apparently

**600**

asks is that the court now rule that the claims set forth in outline in paragraph C are valid, and then hold further hearings as to the amount of these claims. Paragraph C sets forth no specific items but only a statement of the general nature of the claims. Until the court has evidence of the facts showing specifically what the claims are and of the facts supporting the defenses, if any, which IDS may have to these claims, it can make no ruling as to any liability of plaintiff to defendant as to these claims.

Defendant's motion for summary judgment denied.